Filed 10/10/24  Miller v. Ellis CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| THOMAS MILLER,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>DAVID ELLIS et al.,<br><br>    Defendants and Appellants. | G063142<br><br>(Super. Ct. No. 30-2023-01310106)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Glenn R. Salter, Judge.  Affirmed in part and reversed in part.

Katz Law Office, Michael I. Katz and Byron H. Ruby for Defendants and Appellants.

Drooz Legal and Deborah Drooz for Plaintiff and Appellant.

Foley Law Office and Thomas R. Foley as Amici Curiae on behalf of Defendants and Appellants.

Ker Legal Group and Keith E. Rodenhuis as Amici Curiae on behalf of Defendants and Appellants.

\*          \*          \*

As our Supreme Court has explained, Code of Civil Procedure section 425.16, commonly known as the anti-SLAPP statute, "'does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech."[1] Rather, it exists to dispose of *meritless* claims arising from protected activity early in a lawsuit. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.) As such, defamation claims concerning political advertising can survive an anti-SLAPP motion if the plaintiff can show his or her claims have minimal merit. Such is the case here.

Plaintiff Thomas Miller ran for Newport Beach City Council. Defendant Safe Neighborhoods PAC (Safe Neighborhoods) and its principal officer, defendant David Ellis (collectively, defendants), made several campaign leaflets and a website opposing his candidacy. After Miller lost the election, he sued defendants for four counts of defamation based on the website and three leaflets. Primarily, he claimed these materials falsely implied he had misappropriated federal Paycheck Protection Program (PPP) loans for personal use. Defendants filed an anti-SLAPP motion in response. The trial court granted the motion as to the first and fourth causes of action because they had not been sufficiently pled. But it denied the motion as to the second and third causes of action, finding these claims met the minimal merit threshold.

Defendants appealed the court's ruling as to the second and third claims, and Miller cross-appealed the ruling as to the first and fourth claims. Like the lower court, we find some of the claims are barred by the anti-SLAPP statute and some are not, but we disagree with the court as to which claims fall into the former category and which fall into the latter. We find the

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

third and fourth claims are barred by the anti-SLAPP statute because Miller's complaint failed to specifically identify the defamatory statements underlying these claims. Conversely, we find the first and second claims survive the anti-SLAPP motion. Unlike the third and fourth claims, these claims were properly pled. Further, the evidence in the record shows these claims have minimal merit. In particular, there is circumstantial evidence from which a jury could reasonably conclude that defendants made the allegedly defamatory statements with actual malice.

Based on our findings, the trial court's ruling is affirmed in part and reversed in part.

FACTS

Miller owned two auto detailing businesses: Expert Automotive Reconditioning, Inc. (Expert Auto) and Dynamic Auto Images, Inc. (Dynamic Auto). Ellis claims Miller also controlled, but was not a direct owner of, two other business – Automotive Creations, Inc. (Automotive Creations) and Prestige Auto Specialists, Inc. (Prestige) – that he used to provide labor to Expert Auto and Dynamic Auto (we refer to all four businesses collectively as, the companies).[2] Miller's exact relationship to Automotive Creations and Prestige is immaterial to our analysis, so we will not examine his links to them.

During the COVID-19 pandemic, the companies all received Paycheck Protection Program (PPP) loans from the federal government totaling about $4.9 million. The record indicates the loans for Expert Auto, Automotive Creations, and Dynamic Auto were approved in April and May

---

[2] The record indicates Miller sold Dynamic Auto in July 2021 and retired. It is unclear whether he is still currently involved with any of the other companies.

3

2020, while Prestige's loan was approved in February 2021. The loans for Automotive Creations, Expert Auto, and Dynamic were forgiven, while Prestige's loan was apparently "charged off."

Around this time, Miller purchased four properties in Newport Beach totaling roughly $11.5 million (collectively, the four properties). Specifically, he purchased a property in June 2020 for $4.9 million, another in July 2021 for $2.5 million, another in September 2021 for $1.85 million, and another in August 2022 for about $2.27 million.

In January 2022, Miller announced he was running for Newport Beach City Council. Flyers from Miller's campaign advertised his belief "in fiscal responsibility." He also appeared to criticize "big government" in newspaper interviews, stating that during the COVID-19 pandemic, "he saw how the government can have total control over his livelihood" and stated that "[t]hey control my family, my business, they closed my beach." An article in The Epoch Times (the Epoch Times article) that ran in September 2022 also described Miller's business struggles during the COVID-19 pandemic. The article states that "[a]ccording to Miller, his business struggled during the pandemic lockdown, when, for several months people stopped traveling and driving, and he was not able to pay his employees. [¶] However, he found a run-around. [¶] 'I said, I can't afford to pay my people, but I can afford to feed them,' he said. [¶] He said he turned two of his service centers into feeding locations for his employees, and he and his wife rented a U-Haul and filled it with diapers for their children" (the Epoch Times quote). Portions of the Epoch Times quote were later used in opposition ads against Miller.

Appellant Safe Neighborhoods, a political action committee, formed during the 2022 election cycle. Appellant David Ellis is listed as Safe

Neighborhood's principal officer in its Statement of Organization filed with the Secretary of State.

In the weeks leading up to the City Council election, defendants created a campaign website, https://www.safeneighborhoodspac.com (the website), and released three leaflets (the leaflets) opposing Miller's candidacy. The leaflets are attached to this opinion as Appendices A, B, and C, and referred to in this opinion as such.[3] Generally, the website and leaflets quoted the portion of the Epoch Times quote in which Miller claimed he could not "afford to pay [his] people," highlighted the PPP loans he received, and questioned what Miller did with the PPP loans. The website and some of the leaflets also stated that Miller bought four houses in Newport Beach for over $11.5 million and included photos of the four properties. A more detailed description of the leaflets and the website is contained in the discussion below.

Miller lost the election. His opponent receiving 64 percent of the vote, while he received 36 percent.

### PROCEDURAL HISTORY

After the election, Miller filed a complaint (the complaint) against defendants asserting four claims of libel per se based on the website and the leaflets. The first claim was based on the website, the second claim on Appendix A, the third claim on Appendix B, and the fourth claim on Appendix C. Copies of each leaflet were attached to the complaint. The complaint contained no screenshots of the website, nor are there any

---

[3] Each Appendix to this opinion contains two copies of each leaflet. The first is the copy of the leaflet attached to the complaint. The second is a higher quality color copy of the leaflet that was in the record.

5

screenshots of it in the record because the portions of the website concerning Miller were taken down after the election.

While no screenshots of the website are in the record, the complaint described the content underlying the first cause of action: "Under a tab inscribed with the words 'Meet Tom "Slick" Miller,' the Website affixed an image of a clipping from a newspaper article about Miller (the 'Clipping Image'). The Clipping Image contains a partial, decontextualized quote from Miller: 'I can't afford to pay my people.' To the right of the Clipping Image, Defendants affixed an image of what appear to be official forms containing the amounts of PPP loans awarded to four businesses (the 'PPP' Images). The PPP images state: 'Expert Automotive Reconditioning, Inc. $2.45 million; Prestige Auto Specialists, Inc. $1 million; Automotive Creations, Inc. $1.3 million; Dynamic Auto Images, Inc. $120,000. The amounts arc circled in red for emphasis. Beneath the PPP Images, Defendants posted the following words in bold-faced yellow type: 'THEN WHAT DID MILLER DO WITH THE PPP LOANS?' They then provide a false answer to that question: 'Miller bought four houses in Newport for over $11.5 MILLION.' [¶] Defendants illustrated the claim that Miller used PPP loans to buy 'four houses in Newport' with four photographs, captioned as follows: 1808 W. Oceanfront Blvd., 4.9 million; 1831 W. Balboa Blvd., $1.8 million; 207 29th Street, $2.6 million; and 520 Iris, $2.5 million."

The complaint alleged that "[w]hen viewed together, the Clipping Image, the PPP Image, the question, 'Then what did Miller do with the PPP loans?' followed by the illustrated statement, 'Miller bought four houses in Newport for over $11.5 MILION,' convey the false and defamatory accusation that Miller took out four PPP loans for his companies because he could not

6

'afford to pay' his people, but then converted the loan money to his personal use and used it to purchase pricy residential property."

The complaint asserted the above statements constituting the defamatory accusation were false: (1) Miller never used any portion of the PPP loans for purposes other than permitted by the PPP loans; (2) the implication he could not afford to pay his people was false and taken from a quote that was deliberately decontextualized; and (3) Miller did not obtain PPP loans for Prestige or Automotive Creations because he did not own or control those businesses.

The complaint did not describe the leaflets, nor did it specifically allege the defamatory material in them. Rather, it alleged that "[d]efendants republished the false accusations set forth above in a series of three paper campaign advertisements that were mailed to thousands of Newport Beach voters." It then explained the three leaflets were attached to the complaint.

Defendants filed an anti-SLAPP motion under section 425.16 to strike all four claims (the motion). The trial court denied the motion as to the second and third claims, *i.e.*, the claims based on Appendices A and B. It explained that "[t]here is evidence Miller used the PPP funds as intended by the law, to pay his employees. But the juxtaposition of the question and the statement that Miller bought four houses could be viewed by a reasonable trier of fact as an attempt to suggest or imply to the average voter that Miller did not use the funds as intended: He didn't pay his employees; rather, he used those PPP funds to buy luxury homes for his own personal use." Since Miller was a public figure, the court found actual malice could be inferred by circumstantial evidence: "Nothing in Ellis's declaration in support of the anti-SLAPP motion suggests that he investigated or knew as a fact whether Miller

7

had used the PPP funds to pay his employees, or had used them to buy luxury homes."

The court granted the motion as to the first and fourth claims, i.e., the claims based on the website and Appendix C. It explained the copy of Appendix C attached to the complaint, "is very hard to read. The complaint purports to relate what is there but the exhibit is just not clear enough to find that that cause of action has minimal merit. As for the website . . . , the complaint alleges it has been taken down and is now a shell. . . . The complaint purports to state what was there under certain tabs but that is not enough given there are no allegations as to when it was up and whether it was ever accessed or read."

The court also denied a discovery motion filed by Miller to take Ellis's deposition prior to ruling on the motion.

On appeal, defendants contend the court erred by denying the motion as to the second and third claims. Primarily, they argue Miller failed to specifically identify the defamatory statements underlying these claims and also failed to provide sufficient evidence of actual malice. Miller filed a cross-appeal arguing the court erred by granting the anti-SLAPP as to the first and fourth claims or, in the alternative, by denying his motion to take Ellis's deposition. In opposing the cross-appeal, defendants primarily repeat the arguments from their own appeal. Due to this overlap, we discuss the claims subject to the appeal and cross-appeal together, where appropriate.

As explained below, we find the third and fourth claims are barred by the anti-SLAPP statute, while the first and second claims are not.

## DISCUSSION

### I.

### APPLICABLE LAW

This appeal only concerns defamation claims. "The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.'" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) "Publication means communication to some third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made." (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645.)

As for anti-SLAPP motions, "'[t]he Legislature enacted section 425.16 to prevent and deter "lawsuits . . . brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."'" (*Bonni v. St. Joseph Health System* (2022) 83 Cal.App.5th 288, 298.) Significantly, though, "'[t]he anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity.'" (*Monster Energy Co. v. Schechter*, *supra*, 7 Cal.5th at p. 788.)

"'Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. [The Supreme Court has] described this second step as a "summary-judgment-like procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally

sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed."' [Citation.] The grant or denial of an anti-SLAPP motion is reviewed de novo." (*Monster Energy Co. v. Schechter*, *supra*, 7 Cal.5th at p. 788.)

Both sides agree Miller's claims all arise from protected activity and, accordingly, resolution of the motion depends on the second prong. In our analysis, we bear in mind "that a plaintiff's burden at the second anti-SLAPP step is a low one, requiring only a showing that a cause of action has at least '*minimal merit* within the meaning of the anti-SLAPP statute.'" (*Monster Energy Co. v. Schechter*, *supra*, 7 Cal.5th at p. 793, italics added.)

II.

CROSS-APPEAL

We begin with Miller's cross-appeal, which argues the court erred by granting the motion as to the first and fourth causes of action. We agree the court erred by granting the motion as to the first claim but find it correctly granted the motion as to the fourth claim.

A. *The First Claim*

The first claim is based on the website. The court found it lacked minimal merit because the website had been taken down and there were no screenshots of it in the record. Nor were there any allegations as to when it was up or whether it was ever accessed or read. Put differently, the court appears to have found the complaint failed to properly plead publication as to these claims.

10

Miller's claim should not fail simply because defendants took down the website before Miller was able to record its contents. Such a rule would essentially bar a person from bringing a defamation claim against a defendant fortunate enough to take down a defamatory website before copies of it could be made. While defendants argue it is impossible to verify whether Miller's description of the website is accurate, the complaint described its defamatory content with specificity. The complaint explained how the positioning of text and images on the website created the defamatory statement that Miller misappropriated PPP loans to purchase real property. A "plaintiff in a SLAPP motion [has] a certain degree of leeway in establishing a probability of prevailing on its claims due to 'the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery.'" (*Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 530.)

Further, contrary to the trial court's reasoning, the complaint alleged when the relevant portion of the website was accessible and that it was accessed. The complaint alleged defendants created the website, including the portion with the defamatory material, shortly after Ellis formed Safe Neighborhoods on August 1, 2022. The complaint further stated that defendants took down the defamatory material around December 2022, after "Ellis was alerted to the likelihood of litigation in this matter." Based on the complaint's allegations, the website was up from around August 2022 to December 2022. This timeframe sufficiently informs the reader as to when the website was accessible.

As to whether the website was accessed, the complaint alleged it "reached residents of the City of Newport Beach, California, and beyond." The complaint also alleged Newport Beach residents understood the content on

11

the website to be defamatory. Residents could only understand the website's contents to be defamatory if they had read it. Thus, these two allegations combined establish the website was accessed and read. (See *Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 884 (*Medical Marijuana*) ["Publication occurs when a defamatory statement is made to at least one third person"].)

Defendants assert that even if the complaint properly pled publication, Miller failed to present sufficient evidence that the website actually published the defamatory material alleged in the complaint or that any third person read such material. We disagree. Miller submitted a declaration that stated he was the target "of false and disparaging campaign advertisements published online." He explained, these advertisements "stated and/or implied that I used [PPP] loan proceeds for purposes not permitted by the PPP. Most disturbing was the [advertisements] assertion that I used PPP loan proceeds to purchase four expensive homes in Newport Beach." He also declared that "[a]lmost immediately after" the advertisements were posted online, he was harassed by strangers at his home and in public. Likewise, Miller's counsel submitted a declaration that stated

12

copies of the leaflets were posted on the website, providing further evidence of the website's contents.[4]

At this stage of the proceeding, we accept Miller's evidence as true. (*Monster Energy Co. v. Schechter*, *supra*, 7 Cal.5th at p. 788.) The declaration from Miller and his counsel is sufficient to establish the website's content. Miller lacks access to the relevant portions of the website, and we do not expect him to have a photographic memory of its contents. Miller's declaration that he faced harassment after the website was published is enough to show the website was accessed. It would be unfair to expect Miller to have detailed information regarding the website's visitors since he did not operate the website and has not been allowed full discovery in this case. In reaching this conclusion, we emphasize that "a plaintiff's burden at the second anti-SLAPP step *is a low one*, requiring only a showing that a cause of action has at least 'minimal merit within the meaning of the anti-SLAPP statute.'" (*Id.* at p. 793, italics added; *Integrated Healthcare Holdings, Inc. v.*

_____

[4] Defendants argue Miller's evidence shows the only content on the website was copies of the leaflets. In other words, the website simply republished the leaflets and contained no unique defamatory content. Consequently, they assert Miller's claim based on the website violates the single-publication rule. This "rule provides 'that, for any single edition of a newspaper or book, there [is] but a single potential action for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or the book were distributed.'" (*Hebrew Academy of San Francisco v. Goldman* (2007) 42 Cal.4th 883, 890; Civ. Code, § 3425.3.) Even if the website only contained copies of the leaflets, Miller's defamation claim based on the website would not be barred by the single-publication rule. The rule does not apply "when the original defamer repeats or recirculates his or her original remarks to a new audience." (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1243.) The record shows the leaflets were mailed to persons in Newport Beach. Publication of the leaflets on the website recirculated the allegedly defamatory material to a new, broader audience.

13

*Fitzgibbons*, *supra*, 140 Cal.App.4th at p. 530 [a plaintiff is given a degree of leeway due to the early stage in which an anti-SLAPP motion is filed].)

## B. *The Fourth Claim*

As we explain in the next section, the fourth claim was not pled with sufficient specificity. Thus, the court properly granted the motion as to this claim and we will not address the court's reasoning for striking it. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 ["[I]f a judgment is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning"].)

We next turn to defendants' arguments on their appeal, which they also advanced in response to Miller's cross-appeal.

### III.

### PLEADING ISSUES

## A. *Specificity of the Pleadings*

"In order to establish a probability of prevailing on the claim [citation], a plaintiff responding to an anti-SLAPP motion must "'state[] and substantiate[] a legally sufficient claim.'" [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) "If the pleadings are not adequate to support a cause of action, the plaintiff has failed to carry his burden in resisting the motion." (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 31.)

"'"The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint."'" (*Gilbert v. Sykes*, *supra*, 147 Cal.App.4th at p. 31.) "[T]he pleading itself

14

provides the outer boundaries of the issues that are to be addressed in an anti-SLAPP motion. [Citation.] Because '[t]he general rule is that the words constituting an alleged libel *must be specifically identified, if not pleaded verbatim*, in the complaint' [citation], a court need not consider assertions of defamatory statements that are not alleged in the complaint." (*Medical Marijuana*, *supra*, 46 Cal.App.5th at p. 893.) Pleading the substance of the defamatory statement is insufficient. The actual statements must be pled. (*Id*. at p. 894.)

For libel claims, the specificity rule exists to provide adequate notice to both the court and the defendant of the exact words or pictures alleged to be defamatory. (*Medical Marijuana*, *supra*, 46 Cal.App.5th at p. 894; *Comstock v. Aber* (2012) 212 Cal.App.4th 931, 948.) The material must be specifically identified for the court so it can determine as a matter of law whether the material is facially defamatory "'or capable of the defamatory meaning attributed to it by the innuendo.'" (*Comstock*, at p. 948.) The defamatory material must be identified for the defendant so he "'may have notice of the particular charge which he is required to answer.'" (*Des Granges v. Crall* (1915) 27 Cal.App. 313, 315.)

Defendants contend the complaint failed to specifically identify the defamatory material for the claims based on the leaflets (the second, third, and fourth claims). They argue Miller's theory of libel is dependent on a certain arrangement of text and images to create a defamatory implication. As such, Miller was required to allege how the positioning of the text and images in the different leaflets was defamatory. We agree that Miller did not sufficiently identify the defamatory implication created by the text and images in the third and fourth claims (the claims based on Appendices B and

15

C), but we find he properly pled the second claim (the claim based on Appendix A).

### 1. *The Second Claim*

It is said that a picture is worth a thousand words, so we advise readers to review Appendices A, B, and C before reading the descriptions below.

Appendix A is a leaflet folded in half. One side of the outside portion, which appears designed for the reader to view first, contains the Epoch Times masthead followed by the Epoch Times quote: "'According to Miller, his business[es] struggled during the pandemic lockdown, when, for several months, people stopped traveling and driving, and he was no able to pay his employees. [¶] However, he found a run-around. [¶] 'I said, I can't afford to pay my people, but I can afford to feed them,' he said. He said he turned two of his service centers into feeding locations for his employees, and he and his wife rented a U-Haul and filled it with diapers for their children . . . .'" Underneath, a portion of the Epoch Times quote is excerpted and repeated in enlarged text: "'. . . I CAN'T AFFORD TO PAY MY PEOPLE . . .'" Based on the size and location of this excerpt, it is reasonable to assume the reader's eye would be drawn to it prior to reading the smaller and longer text of the Epoch Times quote (if they read the full quote at all).

On the other side of the closed portion of Appendix A, which the reader would encounter next, there are screenshots of what appears to be an official source showing four PPP loans received by each of the companies. The amounts of the loans are circled. Next to each PPP loan screenshot is a caption repeating the name of each company and the amount of the PPP loan it purportedly received: Expert Auto received $2.45 million, Prestige received $1 million, Automotive Creations received $1.3 million, and Dynamic Auto

16

received $120,000. Underneath these screenshots and captions is large, capitalized text asking, "THEN WHAT DID MILLER DO WITH THE PPP LOANS?"

When opened, the inside portion of Appendix A contains a single-page horizontal layout. The top of the page states in large text, "Since His $4.9 MILLION PPP Loans Were Forgiven, Tom 'Slick' Miller. . . ." Below this text, on the left side of the page, are pictures of four houses. Each picture contains a caption listing an address and dollar amount showing the price of each property. The reported prices for the four properties are $4.9 million, $2.5 million, $1.8 million, and $2.5 million. Below the four pictures and their respective captions is large text stating, "Miller bought four houses in Newport for over $11.5 MILLION." Given that the English language is generally read from left to right, it is reasonable to assume readers would view these pictures and text first before moving their eyes to the right.

On the right side of the page, there appears to be a screenshot of a tax form. Some of boxes on the form are circled. Below one of the circles is large text stating, "$525,000!" Below that text, is a box with smaller text claiming, "Miller loaned $525,000 to his city council campaign for a job that pays $1,166 per month."

Below the image of the tax form is another box containing a picture with a man and woman in the forefront. Next to this picture is text stating, "Tom 'Slick' Miller Has Teamed Up With Councilwoman Joy Brenner to Run Newport Beach." Given this text, we presume the man in the picture is Miller and the woman is Joy Brenner. Below the picture and this text, Appendix A states, "WE CAN DO BETTER." Below that is large text stating, "STOP Team Tom Slick."

The very bottom of this page contains smaller text. On the left, there is text directing readers to the website for more information. On the right, there is a small text box indicating the ad was paid for by Safe Neighborhoods.

The arrangement of the text and images in Appendix A largely appears to resemble Miller's description of the website. On Appendix A, the reader first sees large text stating, ". . . I CAN'T AFFORD TO PAY MY PEOPLE . . . ." The reader would flip Appendix A over and see Miller's companies received millions of dollars in PPP loans. The reader would then be asked, "THEN WHAT DID MILLER DO WITH THE PPP LOANS?" The reader would then open Appendix A and see that since Miller's $4.9 million in PPP loans were forgiven, he had bought the four properties for over $11.5 million.

The arrangement of the above elements in Appendix A appears to match the arrangement of the text and images on the alleged website. A jury could conclude the combination of these elements on the website and Appendix A create the impression that Miller misappropriated PPP loan money to purchase real estate. The sequence of images and text create a narrative. Readers are given Miller's quote that he could not "afford to pay [his] people." (Capitalization & ellipses omitted.) They are then told Miller's companies received millions of dollars in PPP loans and shown official looking images of the loan amounts. Appendix A then asks in large text, "THEN WHAT DID MILLER DO WITH THE PPP LOANS?" With this question fresh in their minds, readers open Appendix A and see text stating that since Miller's loans were forgiven, "Miller bought four houses in Newport for over $11.5 MILLION." Simply put, based on the order and proximity of the above elements, a jury could conclude that the question asking what

Miller did with the PPP loans is answered when the reader opens Appendix A: he bought four houses for over $11.5 million.

Since the organization of the text and images on the alleged website largely appears to resemble Appendix A, it was sufficient for defendants to generally allege that the false accusations contained on the website were republished in Appendix A. The reader can review the complaint's description of the website and Appendix A together and reasonably infer how the sequence of text and images in both create the defamatory implication that Miller misappropriated PPP loans to purchase the four properties.

2. *The Third and Fourth Claims*

The third and fourth claims are based on Appendices B and C, respectively, which we describe below.

Appendix B is folded in half. Thus, like Appendix A, the reader would likely see the outside portions first before opening the leaflet to view the inside. On one side of the outside portion, there is text stating, "MEET TEAM TOM 'SLICK' MILLER." Below that header are two pictures. The picture on the left shows a man (apparently Miller) embracing a woman from behind. Below that picture is a caption stating, "Tom 'Slick' Miller $4.9 million reasons to be happy." The picture on the right appears to be the same picture from Appendix A showing Miller with Joy Brenner. Below the picture is a caption stating, "Councilwoman Joy 'Clyda' Brenner." Below these pictures and captions is more text stating, "Tom 'Slick' Miller has teamed up with Councilwoman Joy Brenner to run Newport Beach. *We can do better*." (Italics added.) This is followed by "STOP Team Tom Slick." At the very bottom is a message directing readers to learn more at the website followed by a box indicating the ad was paid for by Safe Neighborhoods.

On the other side of the outside portion of Appendix B, the top shows the Epoch Times masthead followed by author, date, and headline of the Epoch Times article. The headline is followed by a portion of the Epoch Times quote, which generally appears to mirror the quote used in Appendix A. There is large text underneath the Epoch Times quote stating, "SEEMS LIKE A DECENT GUY . . . BUT THERE'S MORE."

Appendix B opens up to expose a single page vertical layout, which the reader would view from the top down. At the top of the page is small text stating, "MILLER SAID HE COULDN'T PAY HIS EMPLOYEES, SO WHAT DID HE DO WITH $4.9 MILLION IN PAYCHECK PROTECTION (PPP) MONEY?" Beneath is smaller text providing more information about the loans received by the companies. The majority of the layout is occupied by the same screenshots of the PPP loans that were used in Appendix A. Like Appendix A, the amount of each loan is circled. Next to each screenshot is a box with text stating the name of each company and the amount of the PPP loan it received. There is also text in the middle right of the page stating that "[t]he purpose of these loans was to pay employees during the government-imposed COVID shutdowns. All of Miller's PPP loans were forgiven by the U.S. Small Business Administration."

Near the very bottom of the page, the leaflet asks, "He said he couldn't pay his employees, what did he do with the money?" After this, the very bottom of Appendix B states, "Vote NO on Tom 'Slick' Miller."

As for Appendix C, the trial court found the copy attached to the complaint was "very hard to read" and was "not clear enough to find that [the fourth claim] has minimal merit." Given the court's ruling, we describe the Appendix C attached to the complaint. We note any illegible information in this copy of Appendix C and identify where we have added material

information from higher quality copies of Appendix C contained in the record (we will not include illegible information that is immaterial to our analysis).

Like the other leaflets, Appendix C is folded in half. On the outside, on the portion of the folded leaflet containing the return address and the recipient's address, there is large text stating, "Vetted [¶] [vet-id] [¶] adjective." Below this, the page states, "Def: investigate (someone) thoroughly, especially to ensure that they are suitable for a job requiring loyalty or trustworthiness."

When the folded Appendix C is turned over, the portion on the other side of the fold states, "Since His $4.9 million PPP [illegible] Were Forgiven, Tom 'Slick Miller' [illegible]." Below this header is a row containing text and five pictures. The first picture from the left is illegible. Above it is text stating, "Miller [illegible] four [illegible] Newport [illegible] $11.5 million." To the right of this picture and text are four other pictures arranged horizontally. Starting from the left, the first picture is illegible. The next three pictures are of the houses that were also used in Appendix A. The three legible pictures have captions. Most of the text is illegible, but one says "$1.6 million," and another says "$2.5 million." From the higher quality Appendix in the record, this portion of Appendix C mirrors the portion of Appendix A showing pictures of the four properties Miller bought along with captions showing each property's address and purchase price.

Beneath the pictures of the houses and accompanying captions are more pictures and text and screenshots that are mostly illegible. There is large text stating, "$525,000" on the bottom left side, "WE CAN DO BETTER" on the bottom right side, and "STOP Team Tom Slick" at the very bottom of the page. A higher quality copy of Appendix C shows the illegible portion mirrors the portion of Appendix A concerning (1) the $525,000 Miller

21

allegedly loaned his city council campaign, and (2) Miller's relationship with councilwoman Joy Brenner.

Appendix C opens into a single-page vertical layout, designed to be read from the top down. The text at the top states in large letters, "Tom 'Slick' Miller'" followed by "Who Vetted This Guy?" To the right of this text is a picture of a man, who we assume is Miller, embracing a woman from behind. Below this row of text is a banner stating, "Millions In State & Federal Tax Liens." Underneath the banner is text stating, "Over the past 22 years, has accumulated millions in state and federal tax [illegible]." Beneath are pictures of what appear to be official documents. On top of each picture is text indicating a sum of money followed by "IRS," which we assume is meant to indicate the amount of each alleged tax lien. Under these documents is large text stating, "CAN WE TRUST MILLER WITH THE CITY'S TAX DOLLARS?"

The section following this question is illegible. Higher quality copies of Appendix C show what appears to be a copy of a letter to Miller from the Department of Justice. To the left of this letter is text explaining, "Miller's company fined $159,000 U.S. Department of Justice – Employee Discrimination."

This illegible section is followed by a picture of the Epoch Times masthead. Underneath the masthead is a quote from Miller, which begins, "'I said,'" but the remainder of the quote illegible. Higher quality copies of Appendix C show the full quote states, "'I said, I can't afford to pay my people, but I can afford to feed them.'" Finally, underneath this quote, is large text asking, "WHAT DID MILLER DO WITH ALMOST $5 MILLION IN PPP LOANS?" This question is followed by screenshots of the PPP loans with the amount of each loan circled.

Here, both the third and fourth claims lack minimal merit because Miller did not specifically identify the defamatory material in Appendices B and C underlying these claims. As set forth above, the complaint did not make any effort to describe the content of the leaflets. Rather, it only detailed how the arrangement of text and images on the website created a defamatory implication that Miller misappropriated PPP loans. The complaint then generally alleged the same defamatory statements were republished in the leaflets, and it attached copies of the leaflets for the readers to view.

The contents of Appendices B and C are materially different from the alleged website. As described in the complaint, the website contained four juxtaposed elements that created the defamatory implication that Miller misappropriated PPP loans: (1) the portion of the Epoch Times quote in which Miller said, "'I can't afford to pay my people'"; (2) next to this quote were images and text emphasizing the amounts of the PPP loans given to the companies; (3) beneath these PPP loan images and text was a question in large text, "'THEN WHAT DID MILLER DO WITH THE PPP LOANS?'"; and (4) this question was followed by pictures of the four properties with captions showing the address and purchase price of each property and the statement, "'Miller bought four houses in Newport for over $11.5 MILLION.'"

Significantly, the complaint alleged that "[w]*hen viewed together*, the [portion of the Epoch Times quote], the PPP Image[s], the question, 'Then what did Miller do with the PPP loans?' followed by the illustrated statement, 'Miller bought four houses in Newport for over $11.5 MILION,' convey the false and defamatory accusation that Miller took out four PPP loans for his companies because he could not 'afford to pay' his people, but then converted the loan money to his personal use and used it to purchase pricy residential

23

property." (Italics added.) Put differently, the specific sequence of these four elements on the website can be read to create the defamatory implication that Miller misappropriated PPP loan money to buy the four properties.

The combination of text and images in Appendices B and C are distinctly different than those described on the website. Significantly, Appendix B does not mention Miller's purchase of the four properties, which is a key component of the defamation claim based on the website. The complaint did not explain how the arrangement of text and images in Appendix B created a defamatory implication. Nor did the complaint identify the specific defamatory implication made by Appendix B. And, given the differences between the alleged website and Appendix B, the complaint's description of the defamatory material on the website does not fill these gaps.

Similarly, while Appendix C references the four properties, it does so on the outside page of the closed leaflet. Thus, the reader would likely see this reference *prior* to being asked what Miller did with the PPP loans, which is on the inside of the leaflet. On the website, the order of these items was reversed. The complaint alleged the reader was asked what Miller did with the PPP loans prior to being told he purchased the four properties for over $11.5 million.

Further, unlike the website or Appendix A, Appendix C references (1) the vetting process for Miller, (2) Miller's alleged tax liens, and (3) a fine apparently imposed on one of Miller's companies by the Department of Justice. These references interrupt the statements concerning Miller's real estate purchases, the PPP loans, and the question asking what Miller did with the PPP loans. As such, their placement creates a different tone and context that was not present on the website or Appendix A. Given this additional information, the complaint needed to identify the defamatory

24

implication made by Appendix C and allege how it was created by the combination of images and text in this leaflet.

To the extent Miller argues Appendices B and C suggest he improperly used PPP loans and/or lied in the Epoch Times article about not being able to pay his employees, the complaint did not specifically allege these Appendices contained such defamatory implications. Nor does it allege how the text and images in these leaflets created such implications.[5]

In short, the complaint failed to identify the specific defamatory statements made in Appendices B and C. It is insufficient for Miller to rely on the allegations concerning the website since its arrangement of text and images differs from those on Appendices B and C. The complaint unfairly asks the court and defendants to analyze these Appendices themselves and construct their defamatory meaning for him.

Finally, we note that Miller did not argue he could amend these claims to make them viable. And even if he had, generally, "[w]hen a cause of action is dismissed pursuant to section 425.16, the plaintiff has no right to amend the claim." (*Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1293; *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073.)

Since we have found Miller's third and fourth claims lack merit, the remainder of this opinion will address defendants' arguments in the context of the first claim (the website) and the second claim (Appendix A).

---

[5] Though Miller has attempted to explain the defamatory significance of the text and images in Appendices B and C on appeal, we disregard such contentions. Miller was required to make such allegations in the complaint, not on appeal. (*Medical Marijuana, supra*, 46 Cal.App.5th at p. 893.)

25

*B. Defamation by Implication*

"A statement is defamatory when it tends 'directly to injure [a person] in respect to his office, profession, trade or business . . . .' [Citation.] Statements that contain such a charge directly, and without the need for explanatory matter, are libelous per se. [Citation.] A statement can also be libelous per se if it contains a charge by implication from the language employed by the speaker and a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter." (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112.)

Because Miller's remaining claims rely on the juxtaposition of certain text and images to create meaning rather than direct statements, defendants contend they rely on a theory of defamation by implication. Citing *Issa v. Applegate* (2019) 31 Cal.App.5th 689 (*Issa*), defendants argue a complaint must allege the following to establish a claim for defamation by implication: "(1) [the plaintiff's] interpretation of the statement is reasonable; (2) the implication or implications to be drawn convey defamatory facts, not opinions; (3) the challenged implications are *not* '"substantially true"'; and (4) the identified reasonable implications could also be reasonably deemed defamatory." (*Id.* at p. 707.)

However, *Issa* does not state a plaintiff must allege the above elements in the complaint to properly plead a claim for defamation by implication. Rather, *Issa* states that "the plaintiff must *demonstrate*" these elements "to maintain an action for defamation by implication." (*Issa, supra*, 31 Cal.App.5th at p. 707, italics added.) Thus, it appears these elements must be shown at trial, but they do not need to be pled in the complaint.

Besides, even if such elements must be pled, Miller has sufficiently alleged them for the first and second claims. As set forth above,

the complaint explained how the images and text on the website and Appendix A imply that Miller misappropriated PPP loans to purchase the four properties (the second element). The complaint stated Miller did not use PPP loans for personal use (the third element). This implication was allegedly defamatory because it falsely accused Miller of unlawful and unethical conduct (the fourth element). Finally, the complaint alleged people reasonably understood the combination of text and images on the website and Appendix A to mean Miller misused PPP loans to purchase the four properties (the first element).

## C. *False Assertion of Fact*

Opinions are not actionable. But "a statement that suggests or implies a false assertion of fact is actionable. [Citations.] The 'dispositive question' in such a case is 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' [Citation.] This is ordinarily a question of law for the court, 'unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood.'" (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 790.)

"In determining whether the disputed statement communicates or implies a provably false assertion of fact, we look at the totality of the circumstances, looking first to the language of the statement and whether it was understood in a defamatory sense, and then considering the context in which the statement was made. [Citation.] We focus not on the literal truth or falsity of each word in a statement, but rather on ""whether the "gist or sting" of the statement is true or false, benign or defamatory, in substance."" [Citations.] We also consider 'whether the reasonable or "average" reader would so interpret the material. [Citations.] The "average reader" is a

27

reasonable member of the audience to which the material was originally addressed.'" (*Edward v. Ellis*, *supra*, 72 Cal.App.5th at pp. 790–791.)

Defendants argue the website and Appendix A contain no false assertion of fact and that Miller's interpretation of these materials is facially unreasonable. They begin by pointing out that Appendix A states Miller's PPP loans were forgiven. In the trial court, Miller argued defendants knew he had not misappropriated PPP loans because (1) they knew the PPP loans were forgiven, and (2) one of their sources for the PPP loans, a website called FederalPay, explains PPP loans are only forgiven if the borrower shows they were used for permitted purposes. On appeal, defendants reference Miller's argument from the trial court and turn it against him. Defendants contend that if they knew PPP loans were only forgiven if used for permitted purposes, then they had no intent to defame Miller because they stated his loans were forgiven on Appendix A. In other words, stating the PPP loans were forgiven on Appendix A told the reader that Miller had not misused the loans.

Defendants then spend several pages explaining that the website and leaflets were meant to convey a message that Miller was a hypocrite and untrustworthy. He was a multimillionaire, campaigning on a small government ticket, who criticized the government's COVID-19 response but took PPP loans from the government. They contend the material concerning Miller's purchase of the four properties was meant to show how the PPP loans indirectly made him wealthier. Specifically, the PPP loans paid for the operating costs of his companies. This allowed his companies to save on costs, increasing their profitability, which financially benefitted Miller.

Defendants proposed reading of the website and Appendix A is reasonable. But we agree with Miller that based on the arrangement of

28

images and text in these materials, they can also be reasonably interpreted to imply that Miller misappropriated the PPP loans to purchase the four properties. As described above, this implication is created by the sequence of (1) Miller's statement that "'I CAN'T AFFORD TO PAY MY PEOPLE'", (2) the screenshots of the PPP loan amounts, (3) the question asking, "THEN WHAT DID MILLER DO WITH THE PPP LOANS?", and (4) the text stating, "Miller bought four houses in Newport for over $11.5 MILLION" along with the photos, addresses, and prices of each house. This implication is a factual statement, not an opinion. Likewise, we disagree with defendants' assertion that the website and Appendix A simply ask an open-ended question about what Miller did with the PPP loans. A factfinder could reasonably conclude the question is not open ended but is answered on the website and in Appendix A: Miller used the loans to purchase the four properties.

*Manzari v. Associated Newspapers Ltd.* (9th Cir. 2016) 830 F.3d 881 (*Manzari*) is instructive. In *Manzari*, the defendant was a newspaper that published a story about the shutdown of the pornography industry in Los Angeles after a female performer tested positive for HIV. "The headline read: 'PORN INDUSTRY SHUTS DOWN WITH IMMEDIATE EFFECT AFTER 'FEMALE PERFORMER' TESTS POSITIVE FOR HIV.' After a few lines of text, the article contained a picture of [the plaintiff] lying suggestively across a bed with 'In Bed With Danni' [(the plaintiff's performer name was Danni Ashe)] written in neon lights behind her. Under her photograph was the caption: 'Moratorium: The porn industry in California was shocked on Wednesday by the announcement that a performer had tested HIV positive.' The article stated that the actress was 'new to the industry' and that 'the performer was not immediately identified.' Later in

29

the article were two other photographs, but not of [the plaintiff]." (*Id.* at p. 884.)

The plaintiff sued defendant for defamation on grounds "the juxtaposition of her image with the explosive headline and caption conveyed the [false] impression that she is the performer who tested positive for HIV." (*Manzari, supra*, 830 F.3d at pp. 885–886.) The defendant filed an anti-SLAPP motion in response. (*Id.* at p. 886.) Among other things, it claimed the identity of the performer who had tested positive was unknown. It had simply selected stock photographs to illustrate the story. The defendant "included the [plaintiff's picture] because it was a 'good, non-obscene photograph to illustrate an article about the pornographic film industry.'" (*Id.* at p. 886.) The defendant also claimed the text of the article explained the performer "was new to the industry and had not been identified" which was "logically inconsistent with the inference that the actress in question was [the plaintiff]." (*Id.* at p. 890.)

Applying California law, the Ninth Circuit rejected these arguments. Although the article "did not affirmatively state that [the plaintiff] was the performer with HIV, . . . the implication and the conclusion were neither subtle nor difficult to divine. The bold headline and its content, juxtaposed with her photograph and yet another caption under her picture that said the industry was 'shocked' that a 'performer had tested HIV positive,' was sufficient for a reasonable reader to infer that [the plaintiff] was the performer who had tested positive for HIV." (*Manzari, supra*, 830 F.3d at p. 889.) The court reasoned, "a photograph itself can convey both an implicit and an explicit message and . . . the headline, caption and photograph taken together are also a statement." (*Id.* at pp. 890.) Even though the article stated the performer had not been identified, "[a] passing

30

reference buried in the article can hardly cure the obvious message conveyed by the headline, photo and caption." (*Id.* at p. 891.)

Like *Manzari*, the arrangement of the pictures and the text on the website and Appendix A create a reasonable implication that Miller misappropriated PPP loans to purchase the four properties. Even though the website and Appendix A stated the PPP loans were forgiven, this information was insufficient to cure the defamatory implication.[6] First, this argument assumes the average reader would understand the requirements for PPP loan forgiveness. But it is unclear whether the average reader would have such knowledge or would try to obtain it after viewing the website or Appendix A. Second, even if the average reader knew the PPP loan forgiveness requirements, he or she might still believe Miller had misappropriated the PPP loans and defrauded the government given the strong implication created by the text and pictures. We cannot say as a matter of law that Miller's interpretation of the website and Appendix A is unreasonable. A jury must answer this question. (*Edward v. Ellis*, *supra*, 72 Cal.App.5th at p. 790.)

Defendants also argue that many of the statements on the website and Appendix A are true. The amounts of the PPP loans given to the companies is largely uncontested (save for the dispute as to whether Miller controlled Prestige and Automotive Creations). The quote about Miller being unable to pay his employees is from the Epoch Times article. It is also undisputed that Miller purchased the four properties. "But even if a

---

[6] Though the complaint did not allege that the website stated the loans had been forgiven, we can determine this through the record. The record shows the website contained copies of the leaflets. Some of the leaflets said the loans had been forgiven. Thus, there was information on the website that the loans had been forgiven.

statement is literally accurate, defamation may be proven if it has a false implication." (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 293.) "'If the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or otherwise creates a defamatory implication, he may be held responsible for the defamatory implication, even though the particular facts are correct.'" (*Price v. Stossel* (9th Cir. 2010) 620 F.3d 992, 1003.) Even if the text and pictures on the website and Appendix A are individually true, they are arranged in a manner that can be reasonably read to falsely imply that Miller misused PPP loans to purchase the four properties.

IV.

ACTUAL MALICE

*A. Evidence Concerning Defendants*

When a plaintiff is a limited public figure, he or she must prove by clear and convincing evidence the defendant made the allegedly defamatory statement with actual malice. (*Edward v. Ellis*, *supra*, 72 Cal.App.5th at pp. 790, 793.) Actual malice means the defendant made the statement "'with knowledge that it was false or with reckless disregard of whether it was false or not.'" (*Id*. at p. 793.) There is no dispute the actual malice standard applies here.

Defendants assert the "'minimal merit'" standard typically applied in prong two of anti-SLAPP analysis does not apply to actual malice. Similarly, while courts typically accept the plaintiff's evidence as true in prong two, defendants claim independent review is required for evidence concerning actual malice. But as this division recently explained when analyzing actual malice, the "burden on prong two is 'not high,' and we are required to 'accept as true all evidence favorable to' [the plaintiff]. [Citation.] Under that low standard, [the plaintiff must meet] his burden of showing his

32

libel claim against [the defendant] has 'minimal merit.'" (*Edward v. Ellis*, *supra*, 72 Cal.App.5th at p. 794; *Collins v. Waters* (2023) 92 Cal.App.5th 70, 80-81, 84.) In prong two, "defamation plaintiffs need not establish malice by clear and convincing evidence. Rather, they must meet their minimal burden by introducing sufficient facts to establish a prima facie case of actual malice. In other words, they must establish a reasonable probability they can produce clear and convincing evidence showing that the statements were made with actual malice." (*Collins*, at p. 80.)

"'"[A]ctual malice can be proved by circumstantial evidence." [Citation.] Considerations such as "anger and hostility toward the plaintiff," "reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff," and "failure to investigate" may, "in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." [Citation.] Such evidence is relevant "to the extent that it reflects on the subjective attitude of the publisher."' [Citation.] However, 'failure to investigate, without more, generally is insufficient' to show malice. [Citation.] And 'we will not infer actual malice solely from evidence of ill will, personal spite or bad motive.'" (*Edward v. Ellis*, *supra*, 72 Cal.App.5th at p. 793.)

In their appellate briefs, defendants concede they had no reason to believe Miller misused PPP loans to buy the four properties. To the extent a defamatory implication was made on the website and Appendix A, they maintain it was unintentional and based on a misreading of these publications. They contend these publications were intended to communicate that the PPP loans paid the costs of Miller's companies, which boosted their profit margins and, in turn, made Miller wealthier so he could buy the four properties. We are unpersuaded. The record contains enough evidence to

33

establish a reasonable probability that Miller can prove actual malice by clear and convincing evidence at trial.

The record shows Ellis has been a political consultant for three decades. There is also evidence he has a history of making leaflets and websites opposing certain candidates. In doing so, he juxtaposes images, quotes, and screenshots to create unflattering portraits of his targets. We do not cite this evidence as proof that Ellis is prone to commit defamation or that he acted with ill intent. Rather, this evidence suggests Ellis is an experienced political campaigner. Thus, it can be reasonably inferred he knows how to frame text and images to convey ideas, and he understands the suggestive power that certain text and images can have when placed together. This evidence supports Miller's claim that the arrangement of text and images on the website and Appendix A was purposeful, not coincidental, and was strategically designed to imply that Miller had misused PPP loans to purchase real estate.

In *Manzari*, the defendant claimed it did not intend to imply the plaintiff had HIV but had simply selected a stock photo to illustrate its story. (*Manzari*, *supra*, 830 F.3d at pp. 885–886.) However, the court concluded that the plaintiff had "raised sufficient factual questions for a jury to conclude that the [defendant] acted with reckless disregard for the defamatory implication in its article . . . . [The plaintiff's] evidence is sufficient to support her claim that the [defendant] placed her photograph in the article, juxtaposed with the incendiary headline and caption, '[knowing or acting] in reckless disregard of whether its words would be interpreted by the average reader as a false statement of fact.'" (*Id*. at p. 892.) "The undisputed message that the article is about [the plaintiff]—apparent from the headline,

photograph, and caption—supports the conclusion that the [defendant] acted with reckless disregard." (*Ibid.*)

Among other things, the court noted that the defendant had replaced the original caption from the stock photo with its own caption stating that a performer had tested positive for HIV. It also failed to include any explanation next to the plaintiff's photograph that she was not the performer that had tested positive. (*Manzari, supra,* 830 F.3d at p. 892.) Though the defendant denied it had intended the implication that the plaintiff had tested positive for HIV, the court cautioned, "the denial must be read in the context of other evidence. If all a publisher needed to do was to deny the allegation, all implied defamation suits would be dead on arrival. . . . [W]illful blindness cannot immunize publishers where they act with reckless disregard for the truth or falsity of the implication they are making." (*Id.* at p. 893.)

Here, the positioning of the text and images in Appendix A and the website was designed by Ellis. It was an editorial choice to juxtapose the question asking what Miller did with the PPP loans and the statement that he had purchased millions of dollars in real property accompanied by photos, addresses, and purchase prices. Given the strong implication created by these elements and Ellis's decades of political experience, a reasonable jury could infer he acted either knowingly or in reckless disregard of "'whether [his] words would be interpreted by the average reader as a false statement of fact.'" (*Manzari, supra,* 830 F.3d at p. 892.) Further, though Appendix A and the website stated the PPP loans had been forgiven, it did not explain what that meant. Defendants may convince a jury that any defamatory implication was accidental. But, given the record, there is enough evidence at this stage to find Miller's first and second claims have minimal merit.

35

*B. Evidence Concerning Safe Neighborhoods*

Defendants also contend there is no evidence showing Safe Neighborhoods acted with actual malice. We disagree. There is sufficient evidence to meet the minimal merit threshold. Ellis is listed as the "Principal Officer" on the Statement of Organization Recipient Committee filed with the State. The principal officer of a political action "committee is the individual primarily responsible for approving the political activity of the committee," which includes, "[a]uthorizing the content of the communications made by the committee." (Cal. Code Regs., tit. 2, § 18402.1, subd. (b)(1).) There is no dispute Ellis designed Appendix A and the website. Appendix A identifies itself as an ad paid for by Safe Neighborhoods. Safe Neighborhoods also concedes it published a website concerning Miller (though it objects to Miller's characterization of it). Thus, there is evidence Ellis was acting on behalf of Safe Neighborhoods when he approved the publication of the website and Appendix A.

V.

DAMAGES

Defendants claim Miller has not shown Appendix A and the website damaged his reputation. But the law presumes damages where statements are libelous per se. (*Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 382.) Defendants argue this presumption should not apply because Miller consented to reputational damage by entering politics. While Miller may have consented to garden-variety political mudslinging, he did not consent to having a political action committee falsely imply he had misappropriated PPP loans to purchase millions of dollars in real property.

Further, Miller provided a declaration outlining the damage to his reputation. Miller stated he began experiencing harassment after the

36

allegedly defamatory material was published. Among other things, his house was egged, and people called him a crook and screamed obscenities at him. This evidence, which we accept as true, shows Miller suffered reputational harm.

## VI.

### MOTION FOR DISCOVERY

Given our rulings above, we do not address the trial court's denial of Miller's motion to take Ellis's deposition. To clarify, our opinion does not prevent Miller from seeking to take Ellis's deposition in the future.

## DISPOSITION

The trial court's order is affirmed in part and reversed in part. The court correctly denied the motion as to the second claim and correctly granted it as to the fourth claim. But it erred by denying the motion as to the third claim and granting it as to the first claim. On remand, we direct the court to enter a new order granting the motion as to the third and fourth claims (the claims based on Appendices B and C) and denying it as to the first and second claims (the claims based on the website and Appendix A). Each party shall bear their own costs on this appeal.

MOORE, ACTING P. J.

WE CONCUR:

GOETHALS, J.

SANCHEZ, J.

37

# Appendix A

MILLER 002



MILLER 001





Paid for by Safe Neighborhoods PAC
3857 Birch St., Suite 125
Newport Beach, CA 92660

ID#1450946

## EPOCH TIMES
By: Sophi Li
September 7, 2022

### Newport Beach's Tom Miller: 'Make Our Community Better for Our Kids and Grandkids'

"…According to Miller, his business struggled during the pandemic lockdown, when, for several months people stopped traveling and driving, and ==he was not able to pay his employees.==

**However, he found a run-around**

"==I said, I can't afford to pay my people,== but I can afford to feed them," he said. He said he turned two of his service centers into feeding locations for his employees, and he and his wife rented a U-Haul and filled it with diapers for their children…"

## "… I CAN'T AFFORD TO PAY MY PEOPLE…"

Photo courtesy of Tom Miller Instagram

PRESORT STD
U S POSTAGE
PAID
TAG

7 P-2 P26 ****************ECRWSH**C009
Gary Cruz
503 38th St
Newport Beach CA 92663-3220

**Automotive Reconditioning Inc.**
**$2.45 million**

**Prestige Auto Specialists**
**$1 million**

**EXPERT AUTOMOTIVE RECONDITIONING, INC.**

| Loan Amount | Amount Forgiven | Location |
|---|---|---|
| $2,418,885 | $2,455,533 includes any accrued interest | Orange, C |

Where applicants said the money will go

| Payroll | $2,418,885 |

**PRESTIGE AUTO SPECIALISTS, INC.**

| Loan Amount | | Location |
|---|---|---|
| $1,094,540 | | Indio, CA Urban |

Where applicants said the money will go

| Payroll | $1,094,540 | Lender |
| Utilities | $0 | Harvest Small |
| Mortgage Interest | $0 | Business Financ |
| Health Care | $0 | LLC |

**AUTOMOTIVE CREATIONS, INC.**

| Loan Amount | Amount Forgiven | Location |
|---|---|---|
| $1,280,800 | $1,306,662 includes any accrued interes | Orange, CA Urban |

Where applicants said the money will go

| Payroll | $1,280,800 | Lender |
| Utilities | $0 | Harvest Sm Business Fi LLC |

**DYNAMIC AUTO IMAGES, INC.**

| Loan Amount | Amount Forgiven | Location |
|---|---|---|
| $119,277 | $120,532 includes any accrued intere | Orange, CA Urban |

Where applicants said the money will go

| Payroll | $119,277 | Lender |
| Mortgage Interest | $0 | FC Marketpl LLC (dba Fu Circle) |

**Automotive Creations Inc.**
**$1.3 million**

**Dynamic Auto Images**
**$120,000**

## THEN WHAT DID MILLER DO WITH THE PPP LOANS?

*Source: SBA Paycheck Protection Program
www.federalpay.org



# Appendix B



44



MILLER 003

45

**SEEMS LIKE A DECENT GUY...**
**BUT THERE'S MORE**

# EPOCH TIMES

By: Sophi Li
September 7, 2022

**Newport Beach's Tom Miller:**
*'Make Our Community Better for Our Kids and Grandkids!'*

"...According to Miller, his business struggled during the pandemic lockdown, when, for several months people stopped traveling and driving, and he was not able to pay his employees.

**However, he found a run-around**

"I said, I can't afford to pay my people, but I can afford to feed them," he said. He said he turned two of his service centers into feeding locations for his employees, and he and his wife rented a U-Haul and filled it with diapers for their grandchildren...."

# MEET TEAM
## TOM *"SLICK"* MILLER



**Tom "Slick" Miller**
$4.9 million reasons
to be happy

Photo courtesy of Tom Miller Instragram



**Councilwoman
Joy "Clyda" Brenner**

**Tom "Slick" Miller** has teamed up with Councilwoman **Joy Brenner** to run Newport Beach. *We can do better.*

**STOP** **Team Tom Slick**

Learn more at www.safeneighborhoodspac.com

Ad paid for by Safe Neighborhoods PAC. ID#1450946.
This advertisement was not authorized by a candidate, or a committee controlled by a candidate.

Paid for by Safe Neighborhoods PAC
3857 Birch St, Suite 125
Newport Beach, CA 92660

46



# Appendix C

MILLER 005





MILLER 006

50

EPA Shorten Time033





EPA Shorten Time034